IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GLORIOUS P. ECHOLS,             )
                                 )    CIVIL ACTION
        Plaintiff,        )
                                 )    NO: 1:10-CV-122-TWT-ECS
v.                           )
                                 )
MICHAEL J. ASTRUE,           )
Commissioner of Social Security,  )
                               )
        Defendant.       )

### FINAL REPORT AND RECOMMENDATION

Glorious Echols, the plaintiff-appellant ("Appellant"), brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c) to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claim for disability benefits. This case is presently before the Court upon the administrative record and the parties' pleadings and briefs. For the reasons expressed herein, it is **RECOMMENDED** that the Commissioner's decision be **REVERSED and REMANDED** for further proceedings consistent with this Report and Recommendation.

## I.
## Procedural History

On April 5, 2007, Appellant, alleging a disability beginning December 15, 2001, filed an application for supplemental social security income. (T. 123). The claim was initially denied on June 18, 2007. (T. 43). The Appellant filed for reconsideration and her

application was again denied on November 8, 2007. (T. 48). After a July 2, 2009, hearing, (T. 21) the Administrative Law Judge ("ALJ") issued a decision on July 31, 2009, finding Appellant not disabled. (T. 14-20). On November 27, 2009, the Appeals Council denied Appellant's request for review. (T. 3-5). On January 14, 2010, Appellant filed her complaint in this Court seeking a review of the Commissioner's decision. [Doc. 1].

## II.
### Factual Background

Appellant, a 5'3" female, was 62 years old at the time of the hearing. (T. 24, 285). She has completed three years of college, (T. 25). Appellant worked as a "clerk in finance" for AT&T from April of 1970 until December of 2001. (T. 25, 133). Appellant was insured for disability through December 31, 2006. (T. 128).

### A.  Medical History

On January 11, 1999, Appellant was treated for hypertension by Patricia D. Glenn, M.D.. (T. 300). Approximately six months later, on July 21, 1999, Dr. Glenn diagnosed Appellant with diabetes. (T. 295). Over the following two years, Dr. Glenn saw Appellant at "follow-up" appointments for high blood pressure and diabetes on October 8, 1999, (T. 292); November 5, 1999, (T. 290); January 4, 2000, (T. 288); April 4, 2000, (T. 283); May 16, 2000, (T. 280); May 19, 2000, (T. 279); July 3, 2000, (T. 274); August 2, 2000, (T.

2

265); October 10, 2000, (T. 262); January 9, 2001, (T. 259); February 20, 2001, (T. 258); June 15, 2001, (T. 251); and September 14, 2001, (T. 247).  During this time Appellant's weight increased from 299 pounds in January of 1999, (T. 300), to 331 pounds in September of 2001, (T. 247).

On January 11, 2000, Appellant underwent a phenol and alcohol procedure of her left hallux,[1] and received strappings bilaterally for plantar fascitis.  (T. 427).  One week later, on January 18, 2000, Appellant saw Dr. Wayne Dubner, DPM, who observed that "post one week P&A, left hallux; patient doing well [and] Patient responding very well to orthopedic arch supports for plantar fascitis."  (T. 427).

On April 11, 2000, Appellant was seen for left knee pain by Dr. Vincent Boswell, M.D., through a referral by Dr. Glenn,.  (T. 271). During her initial visit, Dr. Boswell noted that Appellant "suffers from non-insulin-dependent diabetes mellitus, hypertension and hypercholesterolemia."  (T. 271).  However, Dr. Boswell found "no evidence of pedal edema."  (T. 271).  At the time of the visit, Appellant was taking the following prescriptions: Glucophage,[2]

---

[1]   The hallux is the medical term for a "great toe."  2-D Attorneys' Dictionary of Medicine D-34687.

[2]   A medication used to lower blood glucose in diabetic patients.  3-G Attorneys' Dictionary of Medicine G-50352.

3

Glucotrol,[3] Atenolol,[4] triamterene,[5] hydrochlorothiazide,[6] Lipitor[7] and Advil.  (T. 271).  Appellant also expressed an intention to begin taking estrogen.  (T. 271).

On May 2, 2000, Appellant was seen by Vincent E. Boswell, M.D.. (T. 275).  Dr. Boswell's notes from the visit state that Appellant was "suffer[ing] from grinding, popping, swelling, and severe pain in the left knee."  (T. 275).  During the visit Appellant scheduled a "surgery for left total knee replacement . . . on May 24, 2000." (T. 275).

After her May surgery, on July 3, 2000, Appellant visited Dr. Boswell regarding a possible infection in her left knee.  (T. 267). Upon examination, Dr. Boswell observed that there was "[n]o evidence of obvious infection."  (T. 267).  During the visit, Dr. Boswell diagnosed Appellant with "[a]rthritis [p]ost [t]raumatic."  (T. 266).  He confirmed this diagnosis at a second follow-up visit on July 17, 2000.  (T. 260).  During the July 17, 2000, visit,

---

[3] A drug used to lower blood glucose levels.  3-G Attorneys' Dictionary of Medicine G-50395.

[4] A drug used to treat high blood pressure.  1-A Attorneys' Dictionary of Medicine A-12002.

[5] A diuretic.  5-T Attorneys' Dictionary of Medicine T-118151.

[6] A diuretic.  3-H Attorneys' Dictionary of Medicine H-56533.

[7] A medication used to lower cholesterol.  3-L Attorneys' Dictionary of Medicine L-68247.

Appellant complained of "fatigue, when standing for more than 10 minutes." (T. 261). Based on Appellant's complaints, Dr. Boswell recommended outpatient physical therapy and a return to work on August 16, 2000. (T. 261). With regard to Appellant's work capabilities, Dr. Boswell opined that "six hours would be reasonable, and she could then advance to eight hours after two weeks." (T. 261).

On August 15, 2000, Dr. Boswell provided Appellant with a handicapped parking sticker for one year. (T. 381). At this time, Appellant complained that "[h]er knees feel wobbly, and they often feel as if they are going to give way." (T. 381). Dr. Boswell also observed that "the knee . . . tends to swell on ocassion bilaterally." (T. 381).

Four months later, on December 4, 2000, Appellant saw Dr. Boswell for another follow up. (T. 380). At this time Dr. Boswell observed "[n]o swelling of the knee, ankles or foot . . . gait is normal." (T. 380). Based on this, Dr. Boswell opined that Appellant had "normal function" and that she could "[r]eturn to work with regular duties." (T. 380).

On January 8, 2001, Appellant saw Dr. Dubner again. (T. 426). During the visit Appellant stated that her heel pain was "75% improved" but that she was experiencing pain in her right metatarsal. (T. 426). Appellant informed Dr. Dubner that the

5

"[p]ain is made worse with wearing shoes [and] better with barefeet and resting feet." (T. 426). Dr. Dubner diagnosed Appellant with plantar fascitis in the right foot, and "metatarsal cuneiform exotosis pain right foot-shoe gear related." (T. 426). However, Dr. Dubner found "no evidence of edema, varicosities or telangiectasias." (T. 426).

Sometime during the latter part of 2001, Appellant began to see Joseph Martin, M.D., as her primary care physician. (T. 301). At the outset of her treatment, Dr. Martin diagnosed Appellant with type 2 diabetes, hypertension, arthritis, hypercholesterolemia, obesity (335 pounds) and carpal tunnel syndrom in the left hand. (T. 301). At this time Appellant was taking the following medications: Glucophage, Glyburide,[8] Lipitor, Actos,[9] HZTZ, Atenolol and female hormone replacement therapy. (T. 301).

On May 21, 2002, Appellant returned to Dr. Boswell. (T. 376). During the visit, Appellant reported that she "had no swelling or edema in either leg" and that she had "been able to shop without difficulty." (T. 376). Appellant also represented that she was not taking any pain medications. (T. 376). The same day, Dr. Boswell

---

[8] A hypoglycemic medication to lower the level of sugar in the blood. 3-4 Attorneys' Dictionary of Medicine G-50483.

[9] "[A] drug used as an adjunct to diet and exercise in the treatment of non-insulin-dependent diabetes mellitus." 1-Attorneys' Dictionary of Medicine A-2132.

6

conducted an examination which "revealed evidence of no swelling or edema in the feet or ankle . . . . no swelling or edema in either knee [and a] full range of motion of the knee from 0 degrees to 95 degrees . . . with no evidence of obvious instability." (T. 376). However, Dr. Boswell observed that Appellant, who at that time weighed 338 pounds, was morbidly obese and had "pes planus balgus deformities of both feet." (T. 376).

On March 3, 2003, Appellant saw Dr. Martin for a "follow up/office visit." (T. 185). During this visit Appellant complained of "persistent itching in palm of right hand." (T. 185). Dr. Martin diagnosed Appellant with hypertension, dermatitis and type 2 diabetes. (T. 185).

On May 20, 2003, Appellant had another follow up with Dr. Boswell. (T. 374). Though Appellant complained of "mild pain," she stated that she had "no difficulty climbing or descending stairs, or pivoting on the extremities." (T. 374). Appellant represented that "her hips are doing well," but that she had experienced significant weight gain (T. 374). Dr. Boswell found "no swelling or edema of the feet" but once again noted that Appellant was morbidly obese, weighing 346 pounds. (T. 374).

On June 3, 2003, Appellant saw Dr. Martin for a three month follow up, during which she complained of ringing in her ears. (T. 184).

7

On June 6, 2003, Appellant underwent a bilateral carotid duplex scan at the request of Dr. Martin. (T. 213). The scan revealed "mild plaque formation." (T. 213).

On May 18, 2004, Appellant saw Dr. Boswell and complained of "weakness in the anterior thighs with difficulty arising from a chair. Difficulty climbing stairs and unable to squat [but] no fever, chills, nausea, or vomiting, and knees do not give way." (T. 373). Dr. Boswell conducted an examination and found that Appellant could flex both her knees from 0 to 95 degrees, and that there was no instability of either knee. (T. 373). Dr. Boswell concluded that Appellant was "suffering from weakness in proximal thighs, likely related to lack of exercise and obesity." (T. 373).

In March of 2005, Appellant was referred to Dr. Victoria Musey, M.D., for treatment for her thyroid. (T. 429). During the initial evaluation, Dr. Musey diagnosed Appellant with "[h]yperthyroidism most likely due to toxic nodule." (T. 430).

On June 16, 2005, Appellant had another follow-up visit with Dr. Boswell. (T. 371). During this visit, Appellant complained of "deformity and pain in both knees," but that she had "done quite well recently." (T. 371). Appellant stated that there was "[n]o swelling, no giving way, no severe pain unless walking on concrete." (T. 371). Dr. Boswell observed that Appellant weighed 219 pounds, and that an "[e]xamination of both knees reveals range of motion 0

8

to 95 degrees with no swelling or edema and no deformity." (T. 371). Dr. Boswell concluded that "[t]he patient is doing quite well." (T. 371).

On July 6, 2005, Appellant returned to Dr. Musey's office. (T. 331). During the appointment, Dr. Musey diagnosed Appellant with hyperthyroidism, type-2 diabetes, hyperlipidemia, benign hypertension and obesity. (T. 430). Dr. Musey also found that Appellant had the following "inactive" problems: carpal tunnel sydrome, arthritis, hypertension, hyperlipidemia, peptic acid disease, anemia, obesity, hysterectomy.

On June 26, 2006, Appellant visited Dr. Boswell and complained of "stiffness in both knees . . . . some difficulty walking." (T. 369). Appellant stated that she fell approximately one year earlier, that she was "now having recurrent and consistent pain noted in the [right] shoulder." (T. 369). Appellant claimed that "[o]verhead activity appears to cause some pain and soreness in the shoulder [and] she has some pain with shoulder elevation and notable weakness." (T. 369). Dr. Boswell diagnosed Appellant with "[d]egenerative arthritis" in both knees, and a possible rotator cuff tear. (T. 369-70).

On July 27, 2006, Appellant saw Dr. Boswell and was diagnosed with "a large rotator cuff tear." (T. 368). During the visit Appellant complained that she was "having pain climbing and

9

descending stairs" and that she had "severe stiffness . . . in her right shoulder." (T. 368). Though one month of physical therapy had produced a "significant improvement in her pain" Appellant still "ha[d] some stiffness in [her] shoulder." (T. 368).

On September 13, 2006, Appellant saw Dane A. Ulett, DPM, for "diabetic foot care." (T. 411). Appellant presented with "a painful swollen right ankle [and] a sharp, aching pain that [was] aggravated by activity." (T. 411). Dr. Ulett noted the presence of edema and erythema in Appellant's right tibia as well as "increased calcaneal valgus" bilaterally. (T. 411). Based on these observations, Dr. Ulett "[d]ispensed [an] ankle gauntlet and pneumatic walker." (T. 411). Dr. Ulett also "[a]dvised elevation." (T. 411).

Approximately a month later, on October 4, 2006, Appellant returned to Dr. Ulett's office "for re-evalution of the podiatric problem." (T. 410). During the appointment, Appellant state[d] that she had "no improvement of pain and swelling," but that she had "only been wearing the boot at home." (T. 410). Dr. Ulett noted that "[t]he erythema and edema [were] still present" and "recommended" icing and elevation. (T. 410). Dr. Ulett informed Appellant that she "need[ed] to wear pneumatic walking boot at all times." (T. 410).

10

On November 6, 2007, Dr. Leigh Scott, M.D., a medical consultant for the State agency, completed an RFC assessment for Appellant. (T. 486). In her assessment, Dr. Scott found that Appellant was able to: (1) lift or carry 10 pounds occasionally and less than ten pounds frequently; (2) frequently balance and stoop; (3) occasionally climb, kneel and crouch; (4) never crawl; and (5) occasionally reach. (T. 487-488).

On March 13, 2009, Dr. Ulett completed a "medical assessment of ability to do work-related activities." (T. 119-120). In her assessment, Dr. Ulett made the following conclusions:

> (1) Due to "severe [bilateral] posterior tibial tendonitis dysfunction . . . with ankle instability," Appellant could not stand or walk for more than 1.5 hours in an eight-hour work day and could not stand or walk for more than fifteen minutes at a time.
> (2) Appellant suffered from "swelling with prolonged sitting which causes numbness in her feet [so] her feet need to be elevated."

(T. 119-120)

On June 17, 2009, Dr. Martin conducted a "medical assessment of ability to do work-related activities." (T. 117). In his assessment, Dr. Martin made the following findings:

> (1) Appellant had a rotator cuff tear in her right shoulder, tendinitis in her left elbow, carpal tunnel syndrome in both hands and wrists, tenosynoutis in her left thumb, sleep apnea, type 2 diabetes and morbid obesity. Due to these conditions, Appellant could lift five pounds up to one-third of an 8-hour day, but could not lift any weight for more than one-third of an 8-hour day;

11

(2) In addition to the foregoing diagnoses, Appellant
had pain in her feet from diabetic neruropathy, chronic
swelling in legs and feet requiring elevation, and
chronic fatigue caused by sleep apnea, obesity and
hypertension. Due to these conditions, Appellant could
stand for no more than one hour in an eight hour day,
and no more than five minutes at a time.
(3) In addition to the foregoing diagnoses, Appellant
suffered from chronic neuropathy in her feet and legs
due to diabetes, and chronic swelling in her legs with
a high risk of thrombo embolism from prolonged sitting.
Due to these conditions, Appellant could not sit for
more than two hours in an eight-hour work day.
(4) Appellant could never climb, balance, stoop, crouch,
kneel or crawl.
(5) Appellant was "unable to reach due to rotator cuff
injury." Handling was a "problem due to carpal tunnel
syndrome." Accordingly, Plaintiff's ability to reach,
handle, feel and push and/or pull were limited.

(T. 117-118).

On August 31, 2009, Dr. Martin opined that "[a]ccording to the
medical records and my medical judgment, the restrictions enumerated
in the [June 17, 2009 assessment] have existed to the same degree
of severity since January 12, 2006." (T. 677).

**B.   Hearing Testimony**

On July 2, 2009, the ALJ held a hearing at which Appellant and
a vocational expert ("VE") testified regarding her alleged
disability. (T. 21).

**1.   Appellant's Testimony**

During the hearing, Appellant testified that she worked at AT&T
"in finance" until December 2001. (T. 25). Appellant testified
that at work she worked with a computer and that she "was seated all

day, no more than get up, take a break or go to lunch." (T. 26).
She also claimed that her job did not require that she lift any
weight. (T. 26).

Appellant testified that she left her position because "I was
in so much pain with my knees, my legs and my foot." (T. 26).
Specifically, Appellant claimed that "I had knee replacements in '98
and 2000. And . . . from the diabetes, I have a lot of pain in my
legs. And my foot has started deteriorating, the bone sin my right
foot are deteriorating [and] I started having a lot of pain with my
foot . . . I couldn't walk a distance or stand long during that
time." (T. 26). Appellant testified that she was unable to sit
without elevating her feet to hip level and that she had to elevate
them for 20-45 minutes at a time seven to eight times per day. (T.
26-27).

Appellant testified that "I can only raise my arm up to a
certain extent. I can't go too far away from the shoulder . . . I
can't move it. I can't roll my hair, someone has to roll it for me.
And if I pick up anything the pain is excruciating." (T. 32).

**2.  Vocational Expert**

At the close of testimony, the ALJ proposed the following
hypothetical question to the VE:

> [A]ssuming an individual is capable of lifting 10 pounds
> occasionally, less than 10 pounds frequently; can stand
> and walk 2 hours out of an 8 hour day; who can

13

occasionally   reach   overhead   with   the   right   upper
extremity,  is  there  past  work  such  an  individual  could
perform?

(T. 35).

In response to the hypothetical question, the VE stated that
Appellant would be able to perform her past relevant work of "data
clerk." (T. 35).   Additionally, the VE testified that Appellant
"would have some transferrable skills to other sedentary, semi-
skilled employment [such as] repair order clerk . . . clerical
sorter [or] dispatcher." (T. 35).

After this questioning, Appellant's attorney inquired whether
a person could perform the jobs listed while elevating her legs.
(T. 36).  The VE responded that an individual who had to elevate her
legs like the Appellant was doing in the courtroom, would not be
able to perform Appellant's past relevant work, or the jobs the VE
listed.  (T. 36).  The VE further testified that an individual with
the restrictions listed in Dr. Martin's June 17, 20009, assessment
would not be able to perform any substantial gainful activity.  (T.
36).

### III.
### Standard for Determining Disability

An individual is considered to be disabled for the purposes of
disability payments if he is unable to "engage in any substantial
gainful activity by reason of any medically determinable physical

14

or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. Moreover, the impairment must be of such severity that it precludes the claimant from performing his previous work and, considering his age, education, and work experience, any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3) and 1382c(a)(3)(B)-(C).

The claimant has the initial burden of establishing the existence of a "disability" by demonstrating that he is unable to perform his former type of work. Freeman v. Schweiker, 681 F.2d 727, 729 (11th Cir. 1982). If the claimant satisfies his burden of proving disability with respect to his former type of work, the burden shifts to the Commissioner to demonstrate that the claimant, given his age, education, work experience, and impairment, has the capacity to perform other types of jobs which exist in the national economy. Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983).

Under the regulations as promulgated by the Commissioner, a five-step sequential process must be followed when evaluating a disability claim. 20 CFR §§ 404.1520(a) and 416.920(a). In the

15

sequential evaluation, the Commissioner must consider in order: (1) whether a claimant is gainfully employed, 20 CFR §§ 404.152(b) and 416.920(b); (2) whether the claimant has a severe impairment which significantly limits his ability to perform basic work-related functions, 20 CFR §§ 404.1520(c) and 416.920(c); (3) whether the claimant's impairment meets the listing of impairments found in: 20 CFR §§ 404.1520(d) and 416.920(d); (4) whether the claimant can perform his past relevant work, 20 CFR §§ 404.1520(e) and 416.920(f); and (5) whether the claimant is disabled in light of his age, education, and residual functional capacity, 20 CFR §§ 404.1520(g) and 416.920(f).  If, at any step in the sequence, a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends.  20 CFR §§ 404.1520(a) and 416.920(a).

## IV.
## The ALJ's Decision

After reviewing the medical record and testimony, the ALJ found that Appellant was able to perform her past relevant work.  (T. 19-20).  He then decided at step four of the five step sequential analysis that Appellant was not disabled.

In the course of his decision, the ALJ made the following specific findings and conclusions:

1.   The claimant last met the insured status requirements of the Social Security Act on December 31, 2006.

2.   The claimant did not engage in substantial gainful activity during the period from her alleged onset date of December 15, 2001 through her date last insured of December 31 2006.  (20 CFR 404.1571 *et seq.*).

3.   Through the date last insured, the claimant had the following combination of severe impairments: status post bilateral total knee replacement, hypothyroidism with I131 therapy, diabetes mellitus with polyneuropathy, obesity, chronic kidney disease, and carpal tunnel syndrome and release (20 CFR 404.1520(c)).

4.   Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).

5.   [T]hrough the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she could lift ten pounds frequently, and ten pounds occasionally, occasionally perform climbing, kneeling and crouching and never crawl. Further, she could occasionally perform . . . tasks involving overhead reaching with the right upper extremity.

6.   Through the date last insured, the claimant was capable of performing her past relevant work as a data clerk.  This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.   The claimant was not under a disability, as defined in the Social Security Act, at any time from December 15, 2001, the alleged onset date, through

17

December 31, 2006, the date last insured (20 CFR
404.1520(f)).

8.    Transferability of job skills is not an issue in
this case because the claimant's past relevant work
is unskilled (20 CFR 416.968).

(T. 15-20).

## V.
## Standard of Review

The scope of judicial review of the Commissioner's decision is
limited.   The Court's function is (1) to determine whether the
record, as a whole, contains substantial evidence to support the
findings and decision of the Commissioner and (2) whether the
Commissioner applied proper legal standards.   See Vaughn v. Heckler,
727 F.2d 1040, 1042 (11th Cir. 1984); see also Wiggins v. Schweiker,
679 F.2d 1387, 1389 (11th Cir. 1982).   While the Court defers to the
Commissioner's factual findings, the Court performs a de novo review
of the legal conclusions because "no presumption of validity
attaches to the Secretary's determination of the proper legal
standards to be applied in evaluating claims."   Davis v. Shalala,
985 F.2d 528, 531 (11th Cir. 1993)(citing Bridges v. Bowen, 815 F.2d
622, 624 (11th Cir. 1987)).

## VI.
## Discussion

In her brief, Appellant asserts two grounds for reversal: (1)
"The ALJ and the Appeals Council committed reversible error in

18

failing to set forth the requisite 'good cause' for rejecting the opinion[s] of long-time treating physician[s] Dr. Martin . . . and Dr. Ulett;" and (2) "The ALJ's finding that Ms. Echols retains the residual functional capacity to perform her past relevant work as a 'data clerk' is not based on substantial evidence." [Doc. 8, at 1].  The undersigned will address each contention in turn.

**A.  Did the ALJ and the Appeals Council properly reject the opinions of Drs. Martin and Ulett?**

A Court must undertake two separate inquiries where, as here, a Plaintiff seeks district court review of an Appeals Council decision denying review after the introduction of new evidence. First, the district court must consider whether "the ALJ applied the correct legal standards and adequately developed the record." Walker v. Commissioner of Social Security, 2010 WL 4906743 at *3 (11th Cir. 2010).  Second, the court "must consider whether th[e] new evidence renders the denial of benefits erroneous."  Ingram v. Comm'r of Social Security, 496 F.3d 1253, 1262 (11th Cir. 2007).

**1.  The ALJ's Decision**

Appellant argues that the ALJ erred by failing to credit the 2009 opinions of Doctors Martin and Ulett properly. [Doc. 8, at 15]. Specifically, Plaintiff argues that the ALJ's rejection of the doctors' opinions that Plaintiff was required to keep her legs elevated was not supported by substantial evidence. [Doc. 8, at 18].

19

Plaintiff further contends that "[t]he ALJ's failure to provide specific reasons for rejecting the balance of the opinions of Drs. Martin and Ulett [unrelated to the leg elevation] is reversible error." [Id.].

When assessing medical evidence, the ALJ must "state with particularity the weight he gave the different medical opinions and the reasons therefor." Sharfarz v. Bowen, 825 F.2d 278, 279 (11th Cir. 1987)(citing MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986)). Without a clear statement from the ALJ regarding the weight given to the various medical opinions, "it is impossible for the reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence." Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981); see also Hudson v. Secretary of Health and Human Services, 839 F.2d 1453, 1458 (11th Cir. 1988). Failure to explain the weight given to different medical opinions is reversible error. Sharfarz, 825 F.2d at 279.

Where, as here, the treating physicians offer opinions after the disability insured period has ended, and where such opinions do not relate back to the dates insured, "the ALJ may give little weight to [the] opinion." Jamia v. Astrue, 2010 WL 1997886 at *21 (N.D.Ga. 2010). Thus, an ALJ's decision to reject a non-retroactive opinion is supported by substantial evidence when the "opinion [was]

20

rendered significantly after the insured status expired, and [did not reflect an] opinion as to Plaintiff's condition as it existed during Plaintiff's relevant period of disability." Lofgren v. Astrue, 2008 WL 1323396 at *1 (N.D.Fla. 2008). Here, the ALJ rejected the 2009 assessments produced by Doctors Martin and Ulett as a whole because they did not relate back to the period of last insured. (T. 19). The record supports this basis for the rejection. Accordingly, the undersigned concludes that the ALJ's decision to reject the 2009 assessments was supported by substantial evidence. See id.[10]

### 2.  The Appeals Council's Decision

The undersigned must next consider whether the Appeals Council erred in denying review after the introduction of Dr. Martin's letter in which he opined that the restrictions he found pre-dated Appellant's date last insured. (T. 677). Walker, 2010 WL 4906743 at *4. In this situation, "remand is proper when the evidence was

---

[10]  It is unclear whether Appellant claims that the ALJ properly failed to consider Dr. Ulett's September and October 2006 reports in which he observed edema and recommended elevation. (T. 410-411). However, the ALJ properly rejected these observations by Dr. Ulett on the grounds that "[t]he claimant has not experienced chronic and persistent edema as a result of . . . any . . . impairment for which she is treated." (T. 19). This observation is supported by the record. (T. 442, 444, 508). Accordingly, because inconsistency with the medical evidence warrants good cause to reject an opinion, Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997), the ALJ's decision to reject Dr. Ulett's 2006 reports was supported by substantial evidence.

properly before the Commissioner, but 'the [Appeals Council] did not adequately consider the additional evidence.' " Bennett v. Astrue, 2010 WL 5376346 at *4 (S.D. Ala. 2010).  "To warrant . . . remand, the Court must either find that the decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim." Id. (Citing Poellnitz v. Astrue, 349 Fed. Appx. 500, 504 (11th Cir. 2009)).

Under this framework, a district court must undertake a three step inquiry. Robinson v. Astrue, 365 Fed. Appx. 993, 996-97 (11th Cir. 2010).  First, the Court must inquire whether the evidence was "new when it was presented to the Appeals Council." Id. at 997 (internal punctuation omitted).  Second, the Court must decide whether the evidence was "material because there was a reasonable probability that, if credited, it would change the administrative result." Id. (internal punctuation omitted).  Finally, if the evidence is new and material, the question becomes whether there was

substantial evidence[11] to "discount" it.   <u>Id</u>.   If there is no grounds to discount the evidence, remand is appropriate.   <u>Id</u>.

### a.  Was the Evidence "New?"

Evidence is "new," when it was not presented to or considered by the ALJ.  <u>Robinson</u>, 365 Fed. Appx. At 996-97 ("Robinson did not provide the ALJ with her treating physician's affidavit, and the ALJ had no duty to consider evidence that was not before it.  Therefore, the affidavit . . . was 'new' when it was presented to the Appeals Council.").   In the present case, Dr. Martin's letter opined that, as of January 2006, Appellant: (1) could not lift more than five pounds more than one-third of an 8-hour day; (2) could not stand for more than five minutes without interruption; (3) could not sit for more than two hours in an 8-hour day; (4) could never climb, balance, stoop, crouch, kneel or crawl; and (5) was limited in her ability to reach, handle, feel, push and pull.  (T. 679, 681). Because the letter was not available at the time of the ALJ hearing,

---

[11]  Though the <u>Robinson</u> court did not explicitly utilize the substantial evidence standard, the Eleventh Circuit has consistently stated that a district court's "review of the Commissioner's decision is limited to whether substantial evidence supports the decision and whether the correct legal standards were applied. <u>Colon ex rel. Colon v. Commissioner of Social Security</u>, 2011 WL 208349 at *1 (11th Cir. 2011) (citing <u>Wilson v. Barnhart</u>, 284 F.3d 1219, 1221 (11th Cir. 2002)).   Accordingly, the undersigned concludes that the relevant inquiry is whether the Appeals Council's decision to discount the new evidence is supported by substantial evidence.   <u>See</u> <u>Poellnitz</u>, 349 Fed. Appx. at 504 (applying substantial evidence standard to Appeals Council's decision).

it was clearly "new" evidence to the Commissioner.  See Robinson, 365 Fed. Appx. at 996-97.  Therefore, the question becomes whether any of these restrictions, if credited, could reasonably be expected to change the administrative result.

        **b.  Was the Letter "Material?"**

Here, employing the RFC set forth above in Part IV, the ALJ found that Appellant could perform her past work of data clerk "as actually and generally performed."  (T. 20).  Accordingly, Dr. Martin's opinion could reasonably be expected to change the result only if it included restrictions which would prevent Appellant from performing the work of data clerk as actually and generally performed.

In this regard, Appellant testified that her past work as a data clerk required that she sit and type "all day."  (T. 26). Similarly, the Dictionary of Occupational Titles provides that a data clerk must "[o]perate [a] keyboard . . . to enter data into [a] computer" and that the position "involves sitting most of the time." DICOT 203.582-054, 1991 WL 671700.  Likewise, the DOT notes that the position requires the ability to "constantly" finger, and to "frequently" reach and handle.  Id.  Thus the position of data clerk, as Appellant performed it, and as it is generally performed,

requires the ability to sit, finger and handle.[12]   The undersigned therefore concludes that Dr. Martin's opinion is material to the extent it relates Plaintiff's abilities to sit and handle. Therefore, remand for consideration of Dr. Martin's post-decision opinions on these three topics would be required unless good cause exists to reject them.

  **c.   Does substantial evidence exist to discount the opinions?**

  Where, as here, a treating physician offers an opinion which relates back to the insured period, "that opinion is still entitled to significant weight." <u>Boyd v. Heckler</u>, 704 F.2d 1207, 1211 (11th Cir. 1983).   However, "nothing in <u>Boyd</u>, or any other Eleventh Circuit opinion, precludes the ALJ from according the opinion less weight based on good cause." <u>Rosenburg v. Commissioner of Social Security</u>, 2008 WL 4186988 at *5 (M.D.Fla. 2008).   Thus, a retroactive opinion may be discounted where:   (1) it is not bolstered by the evidence; (2) where the evidence supports a contrary finding; or (3) where the opinion is conclusory or inconsistent with the treating physician's own records." <u>Id</u>. (citing <u>Lewis</u>, 125 F.3d at 1440).

---

   [12]   Because Appellant's previous work did not require the ability to reach, the undersigned concludes that reaching is not material to her past work as it was performed.

### i.  The Sitting Restriction

Dr. Martin concluded that Appellant could not sit for more than two hours in an 8-hour work day because she "has chronic neuropathy in her feet and legs due to diabetes, chronic swelling in legs, [and a] high risk for thromboembolism with prolonged sitting." (T. 679). The Commissioner contends that Dr. Martin's sitting restrictions were properly rejected because the record reflected only trace amounts of edema and because Dr. Scott concluded that Appellant could sit for about 6 hours in an 8-hour workday. [Doc. 10, at 9]. These contentions are without merit.

First, the Eleventh Circuit has recognized that "[t]he good cause required before the treating physicians' opinions may be accorded little weight is not provided by the report of a nonexamining physician where it contradicts the report of the treating physician." Popock v. Astrue, 374 Fed.Appx. 903, 905 (11th Cir. 2010) (quoting Lamb v. Bowen, 847 F.2d 698, 703 (11th Cir. 1988)).[13]  Thus, Dr. Scott's opinion, may not, on its own, provide

_____

[13]    The undersigned notes that "there appears to be some dispute as to the extent of the weight given to a treating doctor's retrospective opinion," Mitchell v. Astrue, 2010 WL 3749201 at *11 (N.D.Ga. 2010).  Accordingly, the undersigned expresses no opinion as to whether the holding of Boyd would apply where a consulting physician's opinion produced during the insured period conflicts with a treating physician's retroactive opinion.  However, the undersigned concludes that where, as here, both the treating and consulting physicians have offered retroactive opinions, the holding of Boyd controls.

sufficient support for rejecting Dr. Martin's opinion. <u>Id</u>. Furthermore, while the lack of edema may provide good cause for partially rejecting Dr. Martin's opinion, there is nothing in the record to contradict the balance of Dr. Martin's opinions insofar as they are based upon his diagnoses of diabetic neuropathy and risk of thromboembolism. Because the Commissioner has not pointed to any other bases for rejecting these diagnoses, or their accompanying restrictions, and the undersigned has been able to find none, the undersigned concludes that the Appeals Council's decision to discount Dr. Martin's opinion regarding Appellant's ability to sit was not supported by substantial evidence. Remand on this ground for consideration of Dr. Martin's evidence is thus required.

### ii.  The handling restriction

Dr. Martin found that Appellant's ability to handle "is a problem due to carpal tunnel syndrome." (T. 681). Upon consideration, the undersigned concludes substantial evidence exists to support the Appeals Council's decision to discount this opinion of Dr. Martin because it was inconsistent with the other medical evidence of record. Specifically, on July 6, 2005, and on July 23, 2007, Dr. Musey opined that while Appellant had carpal tunnel syndrome, the problem was "inactive." (T. 327, 331). Because Dr. Martin's opinion regarding Appellant's ability to handle could be

27

discounted for good cause, the undersigned concludes that remand on this ground is inappropriate.

**B. Did the ALJ Err in Deciding that Appellant Could Perform her Past Relevant Work?**

Appellant contends that the ALJ erred by failing to include factual findings regarding the requirements of her past relevant job. [Doc. 8, at 22-23].

"In finding that a claimant has the capacity to perform a past relevant job, the decision of the Commissioner must contain, among the findings . . . a finding of fact as to the physical and mental demands of the past job/occupation." Byrd v. Astrue, 2010 WL 37490983 (S.D.Ala. 2010) (quoting Social Security Ruling 82-62, 1982)). Failure to meet this requirement may be grounds for remand. Del Rosario-Castillo v. Astrue, 2010 WL 3385508 at *12 (S.D.Fla. 2010). However, this error may be deemed harmless where "[n]one of the RFC limitations found by the administrative law judge [are] inconsistent with performance of the plaintiff's past work as . . . described by the plaintiff herself." Freeman v. Barnhart, 2002 WL 31599017 at *5 (D.Me. 2002).

Here, the ALJ's error was harmless because none of the restrictions found by the ALJ were inconsistent with the requirements of Appellant's past work, as described by Appellant. Specifically, Appellant testified that her past work required only

28

typing and sitting.  (T. 26).  Because the ALJ's RFC finding that Appellant was not limited in her ability to sit or type did not conflict with the physical requirements of her past work as it was performed his error in failing to explain his reasoning properly was harmless.  <u>Freeman</u>, 2002 WL 31599017 at *5.

**C.   Remand for Benefits**

Finally, Appellant asks that this Court remand for benefits. In most cases, the appropriate course of action is to remand for further proceedings.  <u>Davis v. Shalala</u>, 985 F.2d 528, 534-35 (11th Cir. 1993); <u>Bright-Jacobs</u>, 386 F.Supp.2d at 1349-50.  This Court may, however, reverse the Commissioner's decision and remand solely for purposes of calculating benefits where the record is fully developed and the cumulative effect of the evidence establishes disability without any doubt.  <u>Davis</u>, 985 F.2d at 534; <u>Carnes v. Sullivan</u>, 936 F.2d 1215, 1219 (11th Cir. 1991); <u>see also Bright-Jacobs</u>, 386 F.Supp.2d at 1349.

Here, while the undersigned has concluded that Dr. Martin's letter may reasonably be expected to produce a different administrative result, the existence of a disability has not been established beyond any doubt.  <u>See Bennett v. Astrue</u>, 2010 5376346 at *6 n. 8 (S.D.Ala. 2010) ("[w]hile the undersigned finds that [the] report is new and material, and that there is a reasonable likelihood that consideration of it would change the administrative

29

outcome, the undersigned does not suggest that Plaintiff [is disabled]. This is a determination to be made by the ALJ upon proper consideration of [the] report."). Indeed, though the ALJ may not wholly discount Dr. Martin's opinion, she need not adopt the opinion as conclusive because a retrospective opinion is not entitled to controlling weight.

In <u>Mitchell</u>, 2010 WL 3749201 at *12, the appellant's treating physician offered a retroactive RFC which the VE determined would render a person unable to work. <u>Id</u>. In finding that substantial evidence did not support the ALJ's decision to discount the retroactive opinion, the district court, noting that the opinion was not entitled to controlling weight, found that it was appropriate to remand to the Commissioner for re-evaluation of the weight given to the retroactive opinion. <u>Id</u>.

The undersigned finds the <u>Mitchell</u> approach persuasive. Because Dr. Martin's retroactive opinion is not entitled to controlling weight, and thus need not be wholly accepted, the proper course is to remand to the Commissioner for a re-evaluation of Dr. Martin's report. Accordingly, the undersigned declines to remand for benefits.

AO 72A
(Rev.8/82)

## VII.
## Conclusion

Upon review, the undersigned **RECOMMENDS** that the Commissioner's decision be **REVERSED** under sentence four of 42 U.S.C. § 405(g).  On review, the ALJ should consider the effect of Dr. Martin's retroactive opinion upon Appellant's residual functional capacity.

**SO REPORTED AND RECOMMENDED**, this 27th day of January, 2011.

s/ *E. Clayton Scofield III*
E. Clayton Scofield III
UNITED STATES MAGISTRATE JUDGE

31